Filed 2/13/25  In re F.R. CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re F.R., a Person Coming Under the Juvenile Court Law. | H051263 (Santa Clara County Super. Ct. No. 22JV45812A) |
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br> F.R.,<br><br>        Defendant and Appellant. | |

Minor F.R. appeals from the juvenile court's dispositional order adjudging him a ward of the court for violating Penal Code section 286, subdivision (c)(2)(C), sodomy of a minor 14 years of age or older by force or fear, and placing him on probation.  On appeal, F.R. argues that the trial court erred by admitting an English translation of Spanish-language text messages he sent to the victim and a vice principal's testimony about statements F.R. made through an interpreter.  F.R. contends that the admission of the translations violated Evidence Code sections 751 and 753[1] as well as his Sixth Amendment right to confrontation.  And to the extent he forfeited these claims by failing

_____

[1] Unspecified statutory references are to the Evidence Code.

to raise them in the juvenile court, he argues that he was denied the effective assistance of counsel.  We affirm.

## I.     BACKGROUND

### A.     *The Wardship Petition*

In October 2022, the Santa Clara County District Attorney filed a juvenile wardship petition (Welf. & Inst. Code, § 602, subd. (a)) alleging that F.R., then 16 years old, came within the juvenile court's jurisdiction for forcible sodomy of a minor 14 years of age or older (Pen. Code, § 286, subd. (c)(2)(C)).

### B.     *The Contested Jurisdictional Hearing*

#### 1.     *The Prosecution's Evidence*

In October 2022, J.C., a senior in high school, reported to school staff that classmate F.R. had sexually assaulted her the day before.  J.C. and F.R. had been alone in a restroom when F.R. pulled J.C. into a restroom stall and anally raped her by force. According to J.C., F.R. had been making sexual overtures since early in the school term. F.R. had recently moved from Guatemala and only spoke Spanish; J.C. also spoke Spanish and the two communicated with each other in Spanish.

In text messages sent between F.R. and J.C. in the hours after the assault while the two were still at school, F.R. apologized, saying in Spanish, "I'm sorry," and later, "I didn't know what I did."  When J.C. replied that he had hurt her, F.R. texted back, "I'm sorry.  Just forgive me.  I will not do it again.  I'm sorry.  Can we talk, [J.C.]?"  J.C. texted that she wanted him to leave the school because she did not want to see him anymore.  F.R. acknowledged that an apology would not help but said that J.C. needed to believe him and that he was sorry for what had happened.  J.C. told F.R. to leave school or she would contact the police.  F.R. responded, "Okay.  I will see what I do, but please."  F.R. subsequently texted that he would try to be transferred to another school and that he did not want her to tell anyone about what had happened.  After J.C. had returned home and had showered, she texted F.R. that if she saw him the next day, she

2

would call the police. In reply, F.R. asked J.C. to forgive him and said he would not approach her again. F.R. later texted J.C. that he would leave, that she should do nothing, and that he was scared.

J.C. was examined at a hospital, where a nurse found lacerations and abrasions in the anal verge and perianal folds. Further examination would have required the insertion of a plastic device into a patient's anal canal, which the nurse testified many patients decline because it is uncomfortable; J.C. declined. J.C.'s injuries were consistent with penetration by a blunt force object, including a penis, though the injuries could also have been caused by straining or a difficult bowel movement.

### 2. *The Defense*

F.R. denied the assault. According to F.R., he and J.C. had been romantically involved but F.R. also had a girlfriend, L. On the day of the alleged assault, F.R. had decided to end his relationship with J.C. so that he could get back together with L. F.R. wanted to end things with J.C. in person and asked to meet at the restroom. Inside the restroom, when F.R. told J.C. that he wanted to end things with her, J.C. became upset and tried to kiss him. F.R. resisted and eventually pushed J.C. against the wall before leaving.

F.R. was shown copies of the text messages and the translations and acknowledged that he had sent J.C. text messages after meeting her at the restroom. F.R. did not dispute the contents of the messages but offered an explanation that he had been apologetic because he felt bad about what had happened, and he had pushed J.C. hard. F.R. agreed to be transferred to a different school because he was worried about getting in trouble with the police or being deported to his home country, where he had witnessed his grandparents' murder.

Sixteen-year-old E.T. was in the same class as J.C. and F.R. According to E.T., J.C. and F.R. looked like they "got along well" and were good friends. F.R. and J.C. were always talking into each other's ears, and E.T. often saw them hold hands.

3

A DNA expert testified that the absence of male DNA found in J.C.'s forensic examination was not necessarily the result of J.C.'s having showered the day before.

### 3. *The Prosecution's Rebuttal*

Vice Principal M.S. testified that he took J.C.'s report of sexual assault. He also spoke with F.R. the next day through an interpreter. F.R. denied any sexual contact with J.C. but said that he and J.C. had kissed in the restroom. F.R. did not say that he had pushed J.C. or that he had met with J.C. in the restroom to break up with her. M.S. reviewed surveillance footage that appeared to show J.C. leaving the restroom before F.R. did.

### C. *The Juvenile Court's Jurisdiction and Disposition Order*

In June 2023, the juvenile court found true count 1 as alleged in the wardship petition and adjudged F.R. a ward of the juvenile court under Welfare and Institutions Code section 602. At the subsequent hearing on disposition, the juvenile court placed F.R. on probation subject to various terms and conditions.

## II. DISCUSSION

F.R. makes various arguments about the admissibility of his translated statements that were admitted into evidence through two witnesses—text messages he sent to J.C. that were translated from Spanish to English and statements he made to vice principal M.S. that were translated through an interpreter from Spanish to English. He argues variously that these statements were inadmissible because they were translated by anonymous translators who did not file an oath or testify as to their qualifications and that admitting the statements violated his right to confrontation under the Sixth Amendment as the translators were declarants who were not subject to cross-examination. And if any of his arguments were forfeited due to a failure to specifically object on these grounds below, he argues his trial counsel was ineffective. We conclude that F.R. has forfeited his arguments and that on this record, he has not met his burden to demonstrate counsel was ineffective.

4

**A.** *The Objections to the Translated Statements*

In limine, the district attorney moved to admit the text messages as evidence of F.R.'s adoptive admissions to J.C.[2] F.R. moved to exclude the text messages, arguing that these were "inadmissible hearsay" absent proof "at a [section] 403 hearing, that the declarant was [F.]R."

The juvenile court tentatively granted the district attorney's motion in limine to admit the text messages—subject to further objection. The court left open the possibility of a hearing under section 403 "as it becomes necessary."

At the jurisdictional hearing, J.C. testified in English. When she testified that F.R.'s earlier sexual overtures had included text messages, defense counsel renewed his objection, citing "foundation" and his motion in limine. When the court deferred ruling on the objection, the prosecutor then elicited J.C.'s testimony that she and F.R. had exchanged contact information and that F.R. used one phone number to text her and another to message her by WhatsApp, typically identifying himself by first name. When J.C. was later asked about the contents of the post-offense text messages, defense counsel objected that the messages were "hearsay," which the juvenile court overruled after the prosecutor cited section 1220's provision for admissions of a party-opponent.

When J.C. later testified about the content of the text messages, defense counsel objected that it was "improper to have [J.C.] translating . . . these [Spanish-language] texts." In response, the prosecutor argued that J.C. had already testified that she received the messages from F.R. and about what F.R.'s "admissions are," and that the prosecutor had also included a transcript of the text messages. The prosecutor thus argued: "So I

---

[2] "Evidence of a statement is not made inadmissible by the hearsay rule when offered against the declarant in an action to which he is a party in either his individual or representative capacity, regardless of whether the statement was made in his individual or representative capacity." (§ 1220.) Such admissions include statements that "the party, with knowledge of the content thereof, has by words or other conduct manifested his adoption or his belief in its truth." (§ 1221.)

guess I could ask the [c]ourt's preference in terms of her understanding of what's being told to her or the communication that occurred or have her rely on the actual transcription." In response, the court overruled the defense objection, deciding that J.C. could "testify as to how she received or how she understood some messages." The court noted that "there may be some slight differences; for example, the way that she just translated what's on this first page [of the text messages, Exhibit 5] is different than the translation that's been provided by the DA as an aid in Exhibit 5-A. So the Court is going to allow this testimony as to how this witness understood it." The prosecutor then explained that he would have J.C. reference the translation and then testify if she believed the translation was accurate in how she understood the messages and explain if there were any differences. When asked, J.C. testified that the translation accurately reflected her understanding of the conversation she had with F.R.

The next day, defense counsel renewed his objection to J.C. testifying about the contents of the text messages: "I don't think it's proper for a lay witness . . . to interpret the text messages, particularly because there are nuances within the translation." Defense counsel noted that he had translations of the text messages that differed from the prosecutor's exhibit. The trial court acknowledged nuances in language but clarified that "what would be most helpful and relevant to this [c]ourt was . . . how [J.C.] interpreted those messages and not necessarily the literal translation." The court then took defense counsel's objection under submission and again reiterated that what it considered relevant for the jurisdictional hearing was "this witness's understanding of those messages and not necessarily the exact translation."

Screenshots of the text messages (Exhibit 5) and an English translation of those text messages (Exhibit 5-A) were marked for identification and later admitted into evidence.

During the prosecutor's rebuttal case, F.R. did not object when M.S. recounted what F.R. said to him through an interpreter.

6

**B.** *Forfeiture*

Reviewing F.R.'s objections at trial, we agree with the Attorney General that F.R. has forfeited his claims that the admission of translated statements was improper because the translator failed to submit an oath or testify. Under section 353, subdivision (a), the erroneous admission of evidence, even if prejudicial, will not warrant reversal unless "[t]here appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion."

Here, the basis for F.R.'s in limine objections to the text messages was their evidentiary foundation—specifically whether the prosecutor could establish that *F.R.* was the declarant who sent the text messages. F.R. also objected to the propriety of *J.C.*'s testimony about the content of the messages, not to the adequacy or admissibility of the written translation admitted as Exhibit 5-A. What F.R. never argued in the trial court was that the text messages amounted to the hearsay statement of a *translator*. Nor did F.R. object at trial that the admission of Exhibit 5-A implicated the confrontation clause. And F.R. made no objection at all when M.S. testified about his conversation with F.R. assisted by a spoken-language interpreter.

We recognize that "[i]f the trial objection fairly informs the court of the analysis it is asked to undertake, no purpose is served by formalistically requiring the party also to state every possible legal consequence of error merely to preserve a claim on appeal that error in overruling the objection had that legal consequence." (*People v. Partida* (2005) 37 Cal.4th 428, 437 (*Partida*).) But F.R.'s objections *did not* fairly inform the trial court of the grounds for objection he now raises on appeal. Objecting that F.R. might not have sent the text messages did not apprise the trial court of his latest concern that the Exhibit 5-A was a second level of hearsay or needed the translator's attestation to its accuracy under sections 751 or 753. Nor did the objection that J.C.—as a lay witness— could not herself translate the text messages fairly inform the trial court that F.R. was

7

objecting to the written translation admitted as Exhibit 5-A.  And a failure to object to an unsworn witness or interpreter waives the issue on appeal.  (*People v. Carreon* (1984) 151 Cal.App.3d 559, 580–581 [failure to object to unsworn interpreter waives issue on appeal].)

In *Partida*, *supra*, 37 Cal.4th 428, the California Supreme Court recognized a narrow exception to the forfeiture rule where a defendant who objected solely on section 352 grounds could nonetheless argue on appeal that overruling his objection had the "additional legal consequence" of violating due process.  (*Partida*, at p. 438.)  But *Partida* is inapplicable.  *Partida* recognized that a "constitutional argument is forfeited to the extent the defendant argued on appeal that the constitutional provisions required the trial court to exclude the evidence for a reason not included in the actual trial objection." (*Id.* at pp. 437–438.)  And F.R.'s claim is not that the legal bases for objection he asserted at trial have an additional constitutional and statutory consequence but that the evidence admitted over his foundation and hearsay objections was *independently* objectionable under the confrontation clause and sections 751 and 753.

In short, this is not a situation where "the context makes clear that the court and opposing counsel were aware that the confrontation clause was the basis of the hearsay objection," or of F.R.'s appellate assertion that sections 751 and 753 had been violated. (*People v. Holmes* (2012) 212 Cal.App.4th 431, 436.)  F.R.'s appellate arguments are therefore forfeited.  (See *People v. Redd* (2010) 48 Cal.4th 691, 730 [hearsay objection does not preserve confrontation clause claim]; *People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1028, fn. 19 [confrontation clause claim forfeited by failing to raise issue below]; *People v. Alvarez* (1996) 14 Cal.4th 155, 186 [same].)  And had a timely, specific objection been made, the prosecution could have had the opportunity to cure the defect at trial—i.e., by providing further identifying information about the translators or securing an attestation or oath.  (*Partida*, *supra*, 37 Cal.4th at p. 434.)

Recognizing that no objections were made to M.S.'s testimony, F.R. argues that the record demonstrates that objections to the translated testimony would have been futile. But nothing in the record supports F.R.'s argument that the trial court's overruling of objections to J.C.'s testimony about the text messages on other grounds rendered futile *all* objections to translated statements, no matter the basis. "We cannot presume that, because the court denied some other objections made on different grounds, it would necessarily have denied the specific objection at issue here." (*People v. Homick* (2012) 55 Cal.4th 816, 859.)

Finally, F.R. argues that we should nonetheless consider his claims because they present a pure question of law based on undisputed facts. (See *People v. Yeoman* (2003) 31 Cal.4th 93, 118 ["a reviewing court may consider a claim raising a pure question of law on undisputed facts"].) But the factual predicates of F.R.'s claims are not undisputed; they are undeveloped. F.R. is asking us to analyze a legal issue and find error where the factual record is not sufficiently developed for review. Because there was no objection below under either sections 751 or 753 or the confrontation clause, there is no information in the record for us to discern what qualifications the translator had in the translation of the text messages or of F.R.'s statements to M.S., whether the translations were inaccurate, or if the translators had any bias or motive to mislead. (See *Correa v. Superior Court* (2002) 27 Cal.4th 444 (*Correa*) [discussing factors to consider when language-conduit theory applies to statements made through interpreter]; *United States v. Nazemian* (9th Cir. 1991) 948 F.2d 522 [same].) We therefore cannot meaningfully evaluate either his claims of evidentiary or constitutional error. As an evaluation of whether the admission of the testimony was appropriate is not a pure question of law, it has been forfeited by F.R.'s failure to make a specific, timely objection below.

9

**C.** *Ineffective Assistance of Counsel*

Alternatively, F.R. argues that his trial counsel rendered ineffective assistance by failing to argue the grounds he now raises on appeal. To prevail on a claim of ineffective assistance of counsel, F.R. must establish both that his counsel's performance was deficient and that the deficiency prejudiced him. (*Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).) To show deficient performance, he must show that "counsel's representation fell below an objective standard of reasonableness" under prevailing professional norms. (*Id.* at p. 688.) And to establish prejudice, a "defendant must show that there is a reasonable probability"—"a probability sufficient to undermine confidence in the outcome"—"that but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Id.* at p. 694.)

**1.** *Sections 751 and 753*

First, we find that F.R. does not demonstrate that trial counsel was deficient for failing to object to the translated statements under either section 751 or 753. The purpose of an oath under section 751 is to ensure the accuracy of the translation of the written document. Section 751, subdivision (c) requires that a translator take an oath that "he or she will make a true translation in the English language of any writing he or she is to decipher or translate." And presumably, the requirement under section 753 that translators must be sworn and identified in the record (§ 753, subds. (a) & (b)) is likewise meant to assure the reliability and accuracy of translations, permitting parties to learn of the interpreter's qualifications and accuracy and permit the opportunity for cross-examination if necessary. (See, e.g., *People v. Torres* (1985) 164 Cal.App.3d 266, 268 [defendant argued on appeal that absent an interpreter testifying under oath, he was denied due process].)

The California Supreme Court has "repeatedly stressed 'that "[if] the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged[,] . . . unless counsel was asked for an explanation and failed to provide one, or unless there

10

simply could be no satisfactory explanation," the claim on appeal must be rejected.' " (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266 (*Mendoza Tello*).)  This is not a situation where there simply can be no satisfactory explanation.  We recognize that during trial, defense counsel reiterated his belief that it was not "proper" for J.C. as a "lay witness in this setting" to interpret the messages, noting that there were "nuances within the translation" and that he had translations that were different than the prosecution's exhibit.  But in context, this lends no support for the premise that Exhibit 5-A was inaccurate, only suggesting that counsel was noting that J.C. lacked the language expertise to vouch for its accuracy.  And during his own direct examination, F.R. did not contest the accuracy of the translations or convey that his messages had a different literal meaning—his testimony offered alternative explanations for his apologies and his expressed fear of being reported to law enforcement.  And as we have observed, counsel expressed no objection to the contents of the translated statements that were relayed by M.S.  The bare record is consistent with trial counsel's having believed that an objection would have only secured further testimony by the translator of Exhibit 5-A and the interpreter of F.R.'s statements to M.S. about the content of F.R.'s admissions, rather than securing the exclusion of that content.[3]

Accordingly, F.R.'s claim of ineffective assistance of counsel as to the admission of the translations in violation of sections 751 and 753 lacks merit.

### 2.     *The Confrontation Clause*

Second, we find no deficient performance in trial counsel's failure to object to the translated statements on confrontation clause grounds.  F.R.'s arguments based on the confrontation clause are premised on his claim that the translated text messages and

---

[3] On appeal, F.R. consistently characterizes the translations as being prepared by "anonymous" translators.  Although Exhibit 5-A does not on its face identify the translator of the text messages, the record provides no basis to doubt that the parties at trial knew who prepared the translation.

statements made to M.S. were not *his own* statements but should properly be attributed to the translators and interpreters who translated his statements from Spanish to English and who were adverse witnesses that did not appear at trial.

But here too, we cannot rule out a satisfactory explanation for counsel's omission. (*Mendoza Tello*, *supra*, 15 Cal.4th at p. 266.) Indeed, based on defense counsel's earlier objection—that he had translations that differed from the prosecution's—and the fact that defense counsel did not seek to admit his own translations suggests that the defense translations were not materially different from the prosecution's. Furthermore, J.C. attested that the translations were accurate to her understanding of F.R.'s statements, and F.R. himself on direct examination did not contradict the literal meaning of the text messages. F.R. instead offered an alternative explanation for *why* he was apologizing to J.C. and why he was afraid of being reported to the police. The *contents* of the text messages were not at issue, it was the context and meaning behind the messages that were in dispute. Counsel may thus have declined to pursue an objection to the translated text messages on confrontation clause grounds for tactical reasons, seeing no reason to invite the prosecutor to call the translator as a witness without a material dispute over the translation's accuracy.

And to the extent counsel did not object to M.S.'s statements on confrontation clause grounds, counsel may have likewise concluded that doing so would not bolster F.R.'s defense. To be sure, M.S. relayed that F.R. said nothing about going to the restroom to end his relationship with J.C. or pushing her away. But M.S.'s testimony about what F.R. did say did not directly contradict F.R.'s testimony. M.S. indicated that F.R. denied any sexual assault but that he and J.C. had kissed—consistent in part with F.R.'s assertion that he had not assaulted J.C. but J.C. had attempted to kiss him. And F.R. had already testified that he was afraid of being reported to law enforcement because he had pushed J.C., providing a logical explanation for any purported omission in his

statements to M.S.  Counsel may have thus reasonably believed that calling the spoken-language interpreter would not meaningfully assist F.R.'s defense.

Accordingly, F.R. does not meet his burden of demonstrating that his counsel's performance was deficient.  (*Strickland*, *supra*, 466 U.S. at p. 688.)  And because F.R. on appeal does not renew his claim that J.C.'s own understanding of F.R.'s statements—the contents of which went uncontested by F.R.—should also have been excluded, F.R. cannot demonstrate prejudice.[4]

### III.   DISPOSITION

The judgment is affirmed.

---

[4] In his reply brief, F.R. argues that the exception for party admissions found in section 1220 is not exempt from the requirements of sections 751 and 753.  But J.C. was testifying not as a translator but as the percipient witness to whom F.R. sent the messages.  Lay witnesses are entitled to testify as to matters within their personal knowledge.  (§ 702 [testimony of witness is inadmissible unless witness has personal knowledge of the matter].)  And here, J.C. had personal knowledge of messages she exchanged with F.R. and her understanding of his Spanish-language messages (she was also subject to cross-examination about her knowledge of Spanish).  Thus, when J.C. relayed her understanding of F.R.'s testimony, she interposed no additional layer of hearsay by adopting a third-party translation that comported with her personal understanding.

_____
LIE, J.

WE CONCUR:


_____
GROVER, Acting P. J.


_____
WILSON, J.



*People v. F.R.*
H051263